Appeal 16-12-20, James Lewis v. Angela McLean. Good morning, may it please the court. Arsalan Ayani on behalf of James Lewis. What this case comes down to is the difference between how Lieutenant Chicanowitz and Nurse McLean handled Mr. Lewis's medical situation compared to how Lieutenant Shannon Sharp handled it. The prison policy in place was if an inmate who had a medical condition was unable to comply with the security measures and could not get on-site medical attention, the only option was to send him to a hospital. Here, Chicanowitz and Shannon Sharp were faced with similar, same circumstances, and in one situation, Chicanowitz did not follow that protocol, while Shannon Sharp did. But what protocol are you saying that he did not follow? He was informed, correct, and then he, then someone came, Nurse McLean, right? Right. She came right away. So what protocol did he follow? Dr. Joseph, in her declaration, stated that there was a prison policy that when an inmate could not comply with these security measures to get on-site evaluation by, say, somebody like Nurse McLean, the only alternative and the only option was to get him to a hospital to be evaluated. And that's exactly what the situation was here. While Chicanowitz and Nurse McLean did not do that at 6 a.m., instead, when Mr. Lewis said that he was in severe pain, his neck and back hurt, and that he could not move, they asked him to comply. He couldn't comply. Instead, he was given an ultimatum. Chicanowitz said, basically, if you do not get on your knees and crawl over to the door to get shackled, you're not going to receive medical attention. And that's what played out. He didn't get any attention for multiple hours. It was about three hours. Doesn't that happen sometimes at the emergency room? Yes, it does happen at the emergency room. But the difference, I would say, is he was under their control. He was under the guards' control. He had no choice but to rely on them to get his medical attention. And maybe if he was in an emergency room, screaming and crying out of pain, and laying on the floor, asking and asking for medical attention for over three hours, I'm sure at an emergency room, somebody would have resolved that issue. We would hope so. I would hope so. What was his status? In the prison. He was an inmate at the prison. He had been there for a sexual assault charge, which is currently being appealed. Was Luke, Luke, was he able to? Wait, I just want to get, what, was he some, under some extra security? No, there's the. Was there some concern about going in with a prisoner who may be faking or something or rather, so they are hesitant? That's why they say, I can't, I'm not going in there. I don't know what the rules are in the prison with, with his, so I asked what his situation was. I know he had a back, bad, bad back. Was there some reason why you had to be really careful going in that cell? That's a, that's a good question, Your Honor. That's a good point. The record does not indicate that he had any violent past. There's nothing in the record that indicates that he had a history of faking or being of any, giving the guards and medical staff issues prior to this. So nowhere in the record does it show that he was somebody that needed to be. Extra scrutiny. Faked things or he was known to harm officers or attempt to harm officers. The record does reflect that when they did come in, they had like four or five people coming in at one time. Which it's, that is a protocol they have in place to deal with, to deal with inmates, regardless of whether they are violent or non-violent. Towards them, they are sent in with five, five people were sent in, five guards were sent in. One had a taser, one had an electric shield. And the video footage shows them removing him and how many people they staffed. They do that for every prisoner? I said, it seems that because of that, it seemed that he was in a special category where they had to be extra careful. Because he might jump up and grab somebody. The, I, I, I did speculation on my part, but does seem that maybe he, there was a reason why they came in with a taser and several other things when this guy says he can't move. Uh, Your Honor, from the facts, like I stated previously from the record, it does not appear that he was a person with violent behavior in the past. And that might just be a protocol for any extraction of an inmate when they would be unable to comply. Was, was he able to elicit any evidence as to nurse McLean's state of mind regarding her decision to leave him in the cell once he, you know, didn't walk to the door? He attempted to through discovery. There was no depositions taken. There was, there's only declarations that were in the record. And that could be, that's another issue that we raised in our brief. There was certain discovery should have been compelled. But to answer that question, there is a part in her, she does admit, nurse McLean does admit that a person could be in so much pain that they cannot move. And that's what Mr. Lewis stated that morning. But didn't she say that he, I'm sorry. No, go ahead. Didn't she say that he just, he didn't answer some questions? I mean, person can be in so much pain, but if you're being asked questions, there's nothing there that's saying that he's in that much pain or, or responding to all of her questions. In fact, he's refusing to answer at least maybe he's so in so much pain, he's unable to answer. Is that your point? Yes, I see. I saw that in the record as well. There is that he, he was not answering certain questions, but he was telling them he could not move and could not comply. And nurse McLean at no point was able to medically evaluate him. Because that was part of their policy. She had to be, he had to be secured before she could. And she never had a medical evaluation of Mr. Lewis done either at 6 a.m. and nor at 7, 37, 45 when he was, when she was contacted again by Shannon Sharp. And in between that, she did nothing. She did nothing to evaluate Mr. Lewis's condition. What damages is he seeking? Because it's undisputed that his pain was controlled once he got to the hospital emergency room. It would be compensatory damages for the pain and suffering between the time that he originally requested for medical attention. And if the Shekinowitz followed that procedure, he would have been extracted. The doctor would have been called and a team would have been put together. He would have been taken to the hospital. But he had multiple hours of needless pain and suffering. And until the point that he was finally removed, that would be the point of pain and suffering. Do we know how big his cell was specifically? In other words, how far he was removed from the door once he was on the floor? I think it's about, there's nothing in the record that indicates it. But when I did some research on my own, it would seem to be like six to eight or six by nine cell size. It was eight. What happened to the excessive force complaint? Your Honor, we abandoned the excessive force claim. We decided our best move would be to pursue this deliberate indifference claim. So you are still pursuing the deliberate indifference claim as to the guards who transported him? No, those guards were related to the excessive force claim. Okay. And we concede to removing them from it. Okay. And so the two are who? Again, in this, you're doing McLean and Chicanos. Yeah. Thank you. Thank you. Hello, Ms. Potts. Hello. Good morning. Please support. I'm here on behalf of the defendants. And the one thing I kind of want to start out with focusing on here today is the fact that Lewis's claim in this case is a deliberate indifference claim that is somewhat unique and is based solely on the pain that he suffered before he was transferred to the ER. So this is not a situation where there was any permanent harm. And his claim relies heavily on his allegations that for multiple hours he was ignored and humiliated while he was suffering an incapacitating type of pain. Did any of the defendants who instructed him to walk to the door but did not assist him testify that they had a legitimate safety concern or other reason for refusing to act to help him? Not explicitly the way you're putting it. What they did say is that it is standard security protocol to restrain an inmate through the door before taking them to the health services unit. And that was the problem. He could not comply. He was claiming he could not comply with standard security protocol. So they had to figure out a different way to handle the situation. And based on their declarations, you can see that neither of the defendants that are being focused on here today believe that he was in any emergent condition or that he had suffered any traumatic condition. The man was sobbing. Well, he claims he was sobbing. He claims he was sobbing? Can't somebody see if somebody's crying? It's not in Defendant McLean's or Defendant Ciechanowicz's affidavits. But given that, assuming he was sobbing, he was in tremendous pain. We're not disputing that Mr. Lewis was in tremendous pain here. What we're saying is that the record does not support the way he's characterizing the context of this case. If you take away the undisputed prompt actions that were initially taken, which is reporting to the cell immediately, calling the nurse, having the nurse report to the cell, and doing an initial assessment of what's going on. And then you take away the time period at the end of the timeline where it's undisputed that they took, you know, once they called the doctor on call, then they formed a cell extraction team and they extracted him. If you take those time periods away, what we are left with is an hour and 10 minutes of back pain. And we're not saying that doesn't hurt. We're saying that that does not constitute deliberate indifference. We have an hour and 10 minutes where it's a little harder to see what actions were specifically being taken to advance the situation, granted. But that does not rise to the level of a constitutional violation, especially in a situation where we have a man who is suffering from, it was undisputed and known the entire time that this was back pain, as opposed to another type of pain that might be more suggestive of something internal or something traumatic or something that might be exacerbated by a weight. So it's undisputed that everybody knew this was back pain. Okay, excuse me, counsel. First of all, I think we have to be careful about diminishing the issue of back pain. This is only back pain. As even the discharge instructions said, it can be something severe or it can be something mild. But what's cleared, I think, to everybody is something that you can't necessarily see. And until somebody examines that person, either with a physical exam or some type of x-ray, no one knows how severe this is. And I guess the question is that hour and 10 minutes or so, that time from the time that McLean actually came to the cell, looked at him, at him, wouldn't she know? I mean, it's one thing for a lay person to stand back and say, he looked okay to me. He didn't seem like he was doing anything out of the ordinary. But for a nurse to stand outside a cell and have that period of time, which when you say hour and 10 minutes doesn't sound a lot, but if you're in back pain, shouldn't the nurse know that this is something we have to make a determination about and she can't do it by talking to him through a cell? Your point is well taken. And I don't mean to diminish back pain at all. I think my point was that since it was understood this was back pain, this was not something that was visible, that they could not tell that he needed urgent care at that time. Yeah, but you see, here's the problem. At this stage of the proceedings, we must accept Lewis's assertion that he was physically unable to get to the door. And construing the facts in his favor as we must, that is not really a failure to comply with an instruction to walk to the cell door. And we wouldn't dispute that, Your Honor. I agree. We concede that back pain, there's a large spectrum of back pain, and it can cause someone to be unable to walk to the door. So we're not disputing that. What we're talking about here is deliberate indifference. And that requires us to look at the defendant's decision making within the context that they were presented with it. And in this context, whether or not he could actually walk to the door isn't really the point. The point is whether the defendants acted in a manner that was so unreasonable as to constitute deliberate indifference. And we don't think they did. Well, they went away. They went away. They went away because after observing him, they didn't believe that this was a situation that needed an emergency cell extraction. And so they had to figure out a different way to handle it. And Nurse McLean was the one who went away. And she did not have security authorization to go into his cell. So she needed someone else to give her an order of what to do. And that is why when Shannon Sharp told her to call the doctor, she did. And one thing I want to point out here is that... And Shannon Sharp was the guard? She was a supervisor that came on kind of halfway through. But she was a guard. Yes, she was a guard. She had to tell the nurse what medical step to take? Well, she had to address the security elements of this. And I think our position is that there was pain here. There was a medical need. He was taken to the emergency room within three hours of first pressing his call button. And though pain occurs, we can't expect prison officials in the state's highest security prison to prevent all pain. And Lewis's claim is really essentially an argument that they should have made a different decision. They should have acted differently. But that is not a constitutional claim. I think his claim is that they should have acted. Well, they did act. And I think the timeline and the undisputed facts, the undisputed facts, the facts that we all agree on show that they really, they did act. There was about an hour and 10 minutes where it's harder to tell what they were doing. And agreed, if they had called Dr. Joseph sooner, they might have done a cell extraction sooner. But one thing I want to point out that is incorrect in what Lewis's counsel is saying is that they're trying to make a claim as though there's this institution policy, formal policy, that when an inmate cannot comply with security, you have to do a cell extraction. That is not what Dr. Joseph said. And Dr. Joseph does not dictate security policy. She said, if you look at her declaration, she said, the only thing you could do is go in and take him to the ER. So that's what they ended up doing. But that is not a security policy that Janowitz or Nurse McLean disobeyed. They were presented with a situation where they had a man claiming to be in very severe pain, but he could not comply with their security protocol. You know, forgive me, but in the brief, you repeatedly mentioned that he was able to move his hands and feet. Correct. Given that, why not instruct him to keep his hands uncovered and visible much earlier if the reason for delaying assistance was based on security concerns or some sort of protocol? Sure. Good question. They did ultimately do that. And that is in the record that they asked him to take his blanket off. And you can see that. But that's three hours later. Well, it was about an hour and a half later, I think. But yes, it is something, we're talking about a situation where we have multiple defendants who all have limited scopes of their authority here. And I think some delay was caused by the fact that no one person could handle both the medical expertise and the security expertise. And they had to have an interaction between those two professions. Was there some issue with a shift change? Because this started at 530 in the morning. And I think one person, I don't remember, maybe Shannon Sharper, somebody got there at 7. Correct. And I'm just, I don't know when people come and go at the prison. Yes, there was a shift change. That's why I asked about a shift change, because that means somebody... That added a little delay. I think probably because there was a shift change of the supervising officer. Yeah. And when Shannon Sharpe came in, she said, she went back and visited him, did the same things that Kanowitz did, which was ask him to come to the door, saw that he couldn't. And then she said, okay, we have to call the doctor. So she got Nurse McLean to go back to the cell. And Nurse McLean observed him again, talked to him again, and then went and called Dr. Mina Joseph. And then after that, they formed a team. It sort of restarts. And this is where we may get into a negligence situation. But when you're talking about delivery indifference... Right. That's our whole point, is that he suffered some pain, a lot of pain, probably. But this is not a situation that rises to the level of a constitutional claim. And no court, no case in the nation has found deliberate indifference for an hour and 10 minutes of that pain. Let me throw Perez v. Finoglio out at you, 792 F. 3rd, 768, Seventh Circuit, 2015, where we held, quote, even brief unexplained delays in treatment may constitute deliberate indifference. Yeah. And this is where I think we get into the context. And context matters, especially in cases that are deliberate indifference claims based solely on pain. So we have to look at the context. And that's where I think we need to... Where I think Lewis's counsel kind of mischaracterizes the context. We are in the state's most secure facility. The bench asked earlier, what was his status? He was in segregation status for a conduct violation for behavioral problems. So he... And that's not in the record. So take it where you will. But you asked that question. So I wanted to respond to that. Well, no, I'm curious about that. Yeah. He was in a segregated cell, in segregation. So that is different than just... He wasn't in general population. Okay. Correct. That is different. So there is that. And that's why there is a heightened security protocol. Well, wait a minute. That's not in the record. And I don't want you to be arguing it because it isn't fair. Sure. I meant to respond to the question. No, I understand. That was my question. Okay. Yeah. You answered it. What is in the record is that within that security unit, within that solitary unit, the security protocol required an inmate to come to the door, to be restrained, to go to the health services unit. So is there a copy in the record of the prison protocol for providing medical assistance to a prisoner in distress inside his cell? Are you asking if there is a specific policy in the record that talks about going into the cell? But the prison protocol. The prison protocol that's in the record talks about needing the inmate to come to the door and be restrained. That's why there was some delay here. They had to figure out what to do. It didn't fit cleanly into the protocol. He couldn't come to the door. They couldn't see an obvious reason why externally. So they didn't do an emergency extraction. And they had to figure out what to do. And could it have been done more quickly? Definitely. Could Dr. Mina-Joseph have been called an hour earlier? Yes. But that is not deliberate indifference. And that is our position in this case. Okay. Thank you very much. Okay. Give him two. Thank you, Your Honor. I want to touch on a few points. First, most of the issues brought up is for the jury to decide. The jury should decide whether Dr. Joseph should have been called the first time around 6 a.m. There is also this time frame that was discussed. At 5.39 is when he told officers that he could not move and that he was in severe pain. There's even evidence that Shekinah Wentz went back and looked at video footage to confirm, and it did show since 5.15 in the morning, he did not move. And it was verifying what he was stating. So he was in pain more than an hour and 10 minutes. It was multiple, almost three hours, if not more, hours of pain. As for the policy, there was a policy that the doctor stated that if he cannot comply with these protocols and safety measures to be extracted when he has a medical situation, the only option is to send him to the hospital. And that should have been done. A jury could find that that should have happened at 6 o'clock. And he had no history of violence. That's another thing. The record does not show that he was violent. And as to the segregation, I have nothing about the prison information that's in the record to say that there is this general population versus segregated population. I can't answer that because it's not in the record. And that's something that will be determined if this court does remand this case, vacate this judgment and remand this case. And we request that this court does do so. Thank you very much for your time. You were appointed and you have the deep thanks of the court for taking on this assignment. And you're pretty lucky, too, to be under this tutelage of Mr. Winston. Thank you. Thank you very much. Thank you. And thank you, government, always. You know what we do without the government. All right. Case is taken under advised memorial.